The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner John A. Hedrick, the record of proceedings before former Deputy Commissioner Jan Pittman, and the briefs and oral arguments before the Full Commission. The appealing parties have shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission affirms in part and reverses in part the decision of Deputy Commissioner Hedrick.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. On the date of the employee's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between the employee and defendant-employer.
3. Aetna Casualty and Surety Company was the workers' compensation insurance carrier on the risk during the employee's employment with defendant-employer.
4. The employee last worked for defendant-employer from 14 January 1980 through 14 August 1980. During this period of time, the employee was assigned to work at the General Electric plant. The employee earned a total of $10,403.78 during this time.
5. A Social Security Earnings Report is admitted into evidence.
6. An Advisory Medical Committee Evaluation is admitted into evidence.
7. Plaintiff's Responses to Defendants' Discovery Requests are admitted into evidence.
8. Defendants' Responses to Plaintiff's Discovery Requests are admitted into evidence.
 EVIDENTIARY RULINGS
The objections appearing in the depositions of Dr. Gottovi and Dr. Dunn are OVERRULED.
 ***********
The Full Commission finds facts as follows:
 FINDINGS OF FACT
1. At the time of the hearing in 1994, the employee was seventy-four years old and resided in Wilmington, NC. He last worked in 1980 for defendant Metric Constructors, Inc. earning $10,403.78. During his employment with Metric Constructors, Inc. in 1980, plaintiff was assigned to the GE Plant where asbestos insulation was used in all areas at the plant and plaintiff was exposed to asbestos during such employment. Furthermore, plaintiff had also performed work at the Federal Paper Plant in Riegelwood, North Carolina for various contractors over a period of 20 years prior to 1989 during which time he was also exposed to asbestos.
2. In 1991 plaintiff was diagnosed with asbestos-related lung disease.
3. Plaintiff's employment history consisted almost entirely of work as a welder and pipe fitter. The employee smoked one pack of cigarettes per day for more than twenty years and he continued to be a cigarette smoker on the date of the hearing in 1994.
4. The employee first worked for defendant-employer from 10 May 1976 through 26 July 1976 as a pipe fitter and welder at a Federal PaperBoard project in Riegelwood, North Carolina. The employee last worked for defendant-employer at a General Electric plant where he worked as a welder and pipe fitter from 14 January 1980 through 14 August 1980. He was exposed to asbestos at both locations, based upon his uncontradicted testimony at the 1994 hearing.
5. Prior to beginning his work for defendant-employer, the employee worked as a welder and pipe fitter in a Wilmington, North Carolina shipyard. In this position, plaintiff worked on pipes that were insulated with asbestos. He also worked as a welder and pipe fitter for several construction companies. During these employments plaintiff worked on pipes that were insulated with asbestos.
6. As a welder and pipe fitter for defendant-employer in 1980, the employee fabricated and erected pipes at the General Electric plant. The pipes were used to conduct water and were run along the plant's ceiling. Some of the pipes were insulated with asbestos. These insulated pipes were present throughout the General Electric plant. At times, the employee was required to remove insulation from the pipes so that they could be welded. The insulation was wrapped in wire. To remove the insulation, the employee cut the wire with wire snips and then cut through the insulation and removed it from the pipes. The process of removing insulation from pipes created flaky bits of dust from asbestos.
7. The employee worked around asbestos insulation in the General Electric plant nearly every day. There was dust present from the asbestos "all the time". Whenever the employee worked in a "hot area" in the GE plant, he wore a paper mask that covered his mouth and nose. There were pipes in the "hot area" that were insulated with fiberglass and asbestos insulation.
8. While employed by defendant-employer from 14 January 1980 through 14 August 1980, the employee was exposed to the hazards of asbestos dust for at least thirty days, or parts thereof, during seven consecutive calendar months.
9. Persons whose employment exposes them to respirable asbestos fibers have an increased risk of developing pleural effusion, pleural plaques, asbestosis and mesothelioma. The pleura consists of two layers of tissue. One layer lines the lung and the other lines the chest wall. Pleural effusion occurs when there is a build-up of fluid between the two layers of pleura. Pleural effusion, in and of itself, is a benign process, but can impair lung function. Asbestos related pleural effusion can develop ten to fifteen years after exposure.
10. Pleural plaques, which occur fifteen to twenty years after asbestos exposure, consist of calcified deposits and/or built up fibrous tissue on the pleura. Pleural plaques may be either non-progressive or very slowly progressive. The development of pleural plaques is a benign process, but can cause a restrictive breathing defect. Pleural plaques are permanent.
11. Asbestosis consists of interstitial fibrotic changes, including scarring, in the lung. Asbestosis is primarily diagnosed based upon the presence of inspiratory rales or crackles, radiographic evidence of fibrous interstitial changes in the lung, restrictive breathing deficits and a documented history of exposure to asbestos.
12. Plaintiff was examined by Dr. Snyder in 1980. Chest x-rays taken on that date revealed no abnormality. A subsequent chest x-ray ordered by Dr. Snyder on 27 April 1989 revealed no abnormality.
13. The employee was first examined by Dr. Thaddeus L. Dunn on 2 October 1991. An x-ray taken on or about that date revealed that plaintiff had pleural plaques. Dr. Dunn prescribed no treatment because pleural plaques are not treatable. During a follow-up examination in November 1991, Dr. Dunn obtained apical lordotic films which revealed that plaintiff had pleural thickening on the left.
14. Dr. Dunn next examined the employee in May 1993. On that date, plaintiff was experiencing back pain. Chest x-rays obtained on that date revealed hyperinflation consistent with the employee's history of tobacco use and calcification consistent with his pleural plaques. The x-ray revealed no parenchymal mass.
15. Pursuant to the Order of former Deputy Commissioner Pittman, an Advisory Medical Committee examination was performed by Dr. Allen Hayes of Raleigh, NC, on 30 March 1995. As part of the examination, chest x-rays from four views were obtained. Dr. Hayes also reviewed the employee's medical records from Dr. Dunn. The employee had bilateral pleural plaques and calcified plaque on his diaphragm compatible with prior asbestos exposure. He had no small or large opacities, significant thoracic restriction or "clear cut" evidence of pulmonary fibrosis (asbestosis). The results of Dr. Hayes' examination were reviewed by Drs. Boehlecke and Easom, who concurred with Dr. Hayes' conclusion. Dr. Boehlecke noted that some of the results of the testing performed by Dr. Hayes were consistent with emphysema and that the overall findings suggested that emphysema was a major component of the employee's respiratory condition. In Dr. Hayes' view, this evidence supporting the asbestos-associated pleural plaques was unequivocal. He also indicated in his May 5, 1995 report that at that time he could not identify any clear-cut evidence of asbestosis. However, it was his recommendation that Mr. Combs be re-evaluated in 12 months to see if the asbestosis had progressed to a point where he could make a clear-cut diagnosis of the same. In May of 1996, a second Advisory Medical Committee examination was scheduled. However, due to Mr. Combs' deteriorating condition, this second examination was never held.
16. Another chest x-ray was obtained on 14 October 1995 at New Hanover Regional Medical Center. This x-ray was compared with an x-ray obtained on 18 July 1992. The film "again show[ed] marked changes of COPD." The film also showed diaphramatic pleural calcification.
17. On 12 January 1996, chest x-rays from three views were obtained by the New Hanover Regional Medical Center emergency department. These x-rays revealed that the employee had "interstitial opacities, lucencies compatible with chronic obstructive pulmonary disease." The employee also had calcifications of the pleura. This film was interpreted by John L. Remington, M.D.
18. Dr. Dunn last evaluated the employee in January 1997. By that time, the employee had developed Alzheimer's disease and Parkinson's disease. As a result of these conditions, the employee had sustained a debilitating neurologic change and was severely compromised. A single view chest x-ray obtained on 20 January 1997 showed pleural calcification and scarring or atelectasis in the medial aspect of the left base. This film was interpreted by John L. Remington, M.D.
19. It was consistent with the development of asbestosis for the employee's chest x-rays through 1995 to reveal primarily pleural changes until 1996 when the x-rays began revealing interstitial changes at the bases.
20. On 14 February 1997, the employee was transported by ambulance to the New Hanover Regional Hospital emergency department in a semi-responsive condition. Plaintiff arrived in the emergency department at approximately 9:40 a.m. He died at approximately 7:00 p.m.
21. During his hospitalization on 14 February 1997, the employee was under the care of Dr. Gottovi, an expert pulmonologist and former Medical Advisory Committee member. On physical examination, the employee had coarse rales throughout his lung fields, with finer rales at the bases bilaterally. Dr. Gottovi ordered chest x-rays which revealed that the employee had extensive alveolar interstitial process throughout both lungs, severe COPD and pleural calcification at each base. These films were interpreted by Kenny J. Morris, M.D. These films were also reviewed by Dr. Gottovi.
22. Dr. Gottovi rendered an opinion, and the Full Commission finds as facts, that the employee's death was caused by respiratory failure, as a complication of bronchial pneumonia, as a complication of pulmonary fibrosis, secondary to asbestosis. Dr. Gottovi further opined, and the Full Commission finds as fact, that the employee's asbestosis and asbestos-related lung disease caused or was a significant contributing factor in the employee's death. The x-rays obtained on January 1997, January 1996 and October 1995 supported his opinion relating to the cause of the employee's death in that they revealed interstitial scarring and pleural plaquing.
23. Dr. Dunn diagnosed the employee as having pleural plaques and pleural effusion caused by exposure to asbestos. Dr. Dunn opined, and the Full Commission finds as a fact, that a person who worked as a pipe fitter and was exposed to asbestos was at an increased risk of developing asbestos-related diseases as compared to members of the general public not so employed. He further opined, and the Full Commission finds as a fact, that exposure to asbestos would augment an asbestos-related disease process. However, Dr. Dunn never diagnosed the employee as having asbestosis. Dr. Dunn was not a "B" reader. In addition, Dr. Dunn did not review the x-ray obtained by Dr. Gottovi on 14 February 1997 or the x-ray he ordered on 20 January 1997.
24. The employee last worked for defendant-employer on 14 August 1980, when he retired from the work force. The employee was last exposed to the hazards of asbestos while employed by defendant-employer. The employee contracted asbestosis as a result of his exposure to asbestos dust. The employee's asbestosis was augmented by his exposure to asbestos insulation while employed by defendant-employer from 14 January 1980 through 14 August 1980, during which time the employee worked more than thirty days during seven consecutive calendar months.
25. On 14 August 1980, the employee's average weekly wage was $346.80.
26. The employee did not die as a result of asbestosis or as a result of a secondary infection within 350 weeks from the date of his last exposure to the hazards of asbestos. However, he did die within six years of a compensable injury or occupational disease, and within two years of the final determination of disability.
27. Plaintiff is the widow of the injured employee and is the only person entitled to death benefits pursuant to N.C. Gen. Stat. § 97-38.
 ***********
Based upon the foregoing Findings of Fact and stipulations, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The employee was last injuriously exposed to the hazards of asbestos dust in 1980 while employed by defendant-employer. N.C. Gen. Stat. § 97-57.
2. The employee was exposed to the hazards of asbestos dust for at least thirty days, or parts there of, within seven consecutive months immediately preceding his last exposure in August 1980. N.C. Gen. Stat. § 97-57.
3. As a result of his employment with defendant-employer, the employee was exposed to asbestos and contracted the occupational disease asbestosis. N.C. Gen. Stat. § 97-52; N.C. Gen. Stat. § 97-53(24); N.C. Gen. Stat. § 97-62.
4. As a result of his contraction of asbestosis, the employee was entitled to payment of weekly compensation at the rate of $231.21 per week for 104 weeks, commencing 14 February 1997. N.C. Gen. Stat. § 97-61.5(b).
5. Subsection 97-61.6 of the North Carolina General Statutes is applicable in this matter. Although N.C. Gen. Stat. § 97-38's amendment in 1983 arguably expanded the death benefit coverage for all accidents and all occupational diseases, allowing death benefits to be paid within six years of a compensable injury or occupational disease, or within two years of the final determination of disability, whichever is later, this amendment was general in nature while Subsection 97-61.6 speaks specifically to the occupational disease asbestosis. In statutory construction, a later-enacted statute having general effect does not repeal an earlier-passed statute having specific effect. "[i]t is a well established principle of statutory construction that a section of a statute dealing with a specific situation controls, with respect to that situation, other sections which are general in their application." Utilities Comm. v. Electric MembershipCorp., 275 N.C. 250, 260, 166 S.E.2d 663, 670 (1969); Food Storesv. Board of Alcoholic Control, 268 N.C. 624, 628-629,151 S.E.2d 582, 586 (1966).
6. Although subsection 97-61.6 of the North Carolina General Statutes is applicable in this matter the "two years from the date of last exposure" and "350 weeks from the date of last exposure" limitations of that subsection constitute an unconstitutional violation of the equal protection clauses of the state and federal constitutions, in that these limitations operate arbitrarily to bar claims of similarly situated claimants and are not reasonably related to any legitimate government interest. The North Carolina Constitution, Art. I, 8 19, and the 14th Amendment to the United States Constitution prohibit North Carolina from making laws that deny any person the equal protection of the laws. N.C. Gen. Stat. § 97-61.6 must be held unconstitutional if it operates in an unjustifiable and arbitrary manner. See State v.Greenwood, 280 N.C. 651,187 S.E.2d 8 (1972); Cheek v. City ofCharlotte, 273 N.C. 293, 160 S.E.2d 18 (1968); Lindsey v. Normet,405 U.S. 56, 31 L. Ed.2d 36 (1972). Under both the state and federal constitutional standards, the Industrial Commission must review the classification set forth in § 97-61.6 according to whether it has a rational relationship to a legitimate government interest. If persons under the same circumstances and conditions are treated differently, there is arbitrary discrimination, and not classification. In order for a classification to meet the requirements of constitutionality, it must include or embrace all persons who naturally belong to the class . . . . Furthermore, all who are in situations and circumstances relative to the subjects of the discriminatory legislation indistinguishable from those members of the class must be brought under the influence of the law and treated by it in the same way as are the members of the class. State v. Glidden Co., 228 N.C. 664, 667, 46 S.E.2d 860
(1948); (quoting 12 Am. Jur., Constitutional Law, §§ 478 and 479).
7. In the present case, people who die from asbestosis or silicosis, but who die after the 350 week period set forth in § 97-61.6, are classified separately from those who die within this period. There is no justification for this scheme other than to limit the number of people (all similarly situated in that they all have the same disease caused by their employment) to whom compensation is due. Furthermore, if asbestosis victims are subject to the 350-week limitation set forth in § 97-61.6, then they are being treated differently from all other occupational disease victims to whom § 97-38 and a less restrictive limitations period of six years apply. Again, there is no justification for applying a shorter limitations period to asbestosis and silicosis than is applied to other occupational diseases. This case is similar to the case of Walters v. Blair, 344 N.C. 628, 476 S.E.2d 105
(1996), where the North Carolina Supreme Court affirmed percuriam a Court of Appeals decision, 120 N.C. App. 398,462 S.E.2d 232 (1995), in which the latter court determined that N.C. Gen. Stat. § 97-63
unconstitutionally discriminated against victims of asbestosis and silicosis, who were similarly situated with all other occupational disease victims, but treated differently by the statute. This statute required that Walters, a plaintiff with asbestosis, be exposed to asbestos dust for a period of not less than two years in the state of N.C. during the ten years prior to his last exposure to asbestos while working for the defendant employer. The Court found no justification for the differential treatment given to those with asbestosis and silicosis and struck the above provision.
8. The "two years from the date of last exposure" and "350 weeks from the date of last exposure" limitations set forth in Subsection 97-61.6 of the North Carolina General Statutes being unconstitutional, N.C. Gen. Stat. § 97-38 would apply, resulting in $2,000.00 in burial benefits and 400 weeks of compensation benefits for the death of Spencer Combs, Sr.
9. Spencer Combs, Sr.'s death resulted proximately from a compensable injury or occupational disease and within six years thereafter, or within two years of the final determination of disability and plaintiff, as the widow of the deceased employee, is therefore entitled to 400 weeks of compensation at the rate of $231.21 per week. N.C. Gen. Stat. § 97-38. In case of a widow who is unable to support herself because of physical or mental disability as of the date of death of the employee, compensation payments shall continue during lifetime or until remarriage N.C. Gen. Stat. § 97-38.
10. Plaintiff is entitled to $2,000.00 for burial expenses of Spencer Combs, Sr.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff compensation at the rate of $231.21 per week for 104 weeks, commencing 14 February 1997. This amount shall be paid in a lump sum without commutation, subject to the attorney's fee approved in paragraph 5.
2. Defendants shall pay all medical expenses incurred by the employee as a result of his asbestosis.
3. Defendants shall pay $2,000.00 burial expenses to plaintiff.
4. Defendants shall pay 400 weeks of compensation to plaintiff at the rate of $231.21 per week, commencing 14 February 1997. Payments which have already accrued shall be paid in a lump sum, subject to eight percent interest from the dates due through the date paid and subject to attorneys fees.
5. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff, excluding interest, is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum due plaintiff in paragraphs 1 and 4 shall be deducted from that amount and paid directly to plaintiff's counsel. Thereafter, every fourth check due under paragraph 4 shall be paid directly to said attorney.
6. Defendants shall pay the costs, including expert witness fees of $300.00 to Drs. Dunn and Gottovi.
This 17th day of July 1998.
 S/ _______________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER